Case number 14-1232 at L. Design Technology Group, LLC, doing business as Betty Page Clothing and DTG California Management, LLC, doing business as Betty Page Clothing Petitioners v. National Labor Relations Board. Mr. Koch for the petitioners, Ms. Isbell for the respondent. Morning. I'm pleased to report David Koch for Design Technology Group of DTG California. I reserve two minutes for rebuttal. And, Your Honor, this case, really, the question in this case is whether the requirement of an honest and reasonable belief really means anything. The Section 7 of the NLRA requires concerted activity be for the purpose of mutual aid or protection. You can have concerted activity without it being protected activity. But the NLRB has taken the position, essentially, that any concerted activity is automatically protected, irrespective of the motive or the purpose of that conduct. Well, whatever the merits of that argument, in this case, that was an even-if aspect of the decision. And they said that there was no credited evidence that the employee's actions were taken to entrap. That's what the board said. And the ALJ said it was frivolous. So we don't even have to decide that question. The question is whether the board's and the ALJ's decision that there was no credited evidence of sham, or however you want to use the words, supported by substantial evidence. That's correct. And the evidence-I'm not sure what further evidence you could have in a case like this to show entrapment, other than- Well, you could have evidence of people saying, we intend to entrap. That's not-and the board didn't find that kind of evidence. The evidence, though, was clearly-the actual-the question's case is about the Facebook posts. And, first, the NLRB said these previous Facebook posts were important. We need to read those for what they say. But the subsequent posts that were the clear evidence of entrapment, where Ms. Morris said, Muhahaha, they've fallen into my crutches. And when asked at the hearing what that meant to her, she said, well, that would mean I've lured them in. But when I said it, it didn't really mean anything. So what she-what the NLRA or NLRB would like to say is, look at it for what it says, but don't give any credit to it. Words have meaning, but in this case, they don't. Well, I mean, here you have an ALJ who's making a credibility determination. And, I mean, to skip to the bottom line of that determination, the ALJ believes-believed her that this was not any plan to do a sham. It was a reference to this monkey's quotation. Now, maybe that's wrong. Maybe you're right. But that's not the test for us. The test isn't whether you're wrong or right. The question is whether the very deferential review that we provide, where we really don't even review credibility questions at all, is sufficient here. Right. Well, two- Because I'm right about that, right? That's what the question is. Two points on that. Correct. So to the extent that just credibility-and we're not asking the court to overturn a credibility determination here. We understand the standard there is high. But here, when the actual claiming party is making an admission that they've fallen into my crutches, they've fallen into my clutches, I've lured them in, they've done what I've asked them to do, And then, in addition to that, what is also critical here is we sent out subpoenas asking for the information that would further indicate the nature of this plan. And this Morris was the daughter of a paralegal at a law firm, and she brought in a worker's rights book and said, I didn't know what was in there, but I knew there might be some things in there, essentially a prop in this entire scheme. And so we said, in the subpoena, give us all the documents. Give us all the rest of the Facebook posts, because it's quite clear in the appendix- Regardless of what they related. Well, at that time, there, for instance, on the appendix number 393, there is a post that's cut off that says, again, mwahaha, what a funny day I've had. And then we asked at the hearing, what followed that? What did you say after that? Well, I don't know, because she was talking about the events of the day of the termination. She was talking about the fact that she celebrated when she was fired. And the ALJ found that even though she celebrated, Ms. Thomas celebrated when they were fired, even though the manager gave testimony exactly along those lines, that the manager's testimony must have been fabricated, because it squared up with what the workers had actually said in their Facebook posts. In essence, the workers made an admission that they celebrated when they were fired. The manager had testimony that corroborated that, but the ALJ found, well, that testimony must have been created to fit within the Facebook posts, when those are admissions of the parties themselves. So when those subpoenas went out, and Ms. Morris came back and said, I didn't look for anything. You guys had all of it. I didn't even look for it. At that point in time, the employer was deprived of the right to be able to test this when Ms. Morris admitted. In words that couldn't be any more clear, that they'd fallen into my clutches, or my crutches, as she said, that her plan had succeeded. What else did she say about that? She must have said something else. She continued to talk about her terrible job, how she was so glad she was away from that poor manager. And when we're deprived of the ability to obtain that evidence, when Ms. Morris says, I'm not going to provide it, and the ALJ says, she said it would be fruitless. Move on. Don't ask her any more about it. We're not going to go into there any further. I'm having a hard time finding, at least in the ALJ's written opinion, any resolution of the subpoena question. He drops a footnote, but it doesn't seem to resolve the issue that you've raised. And then you filed exceptions, right? Correct. That dealt with the subpoena, and the board decision that we're reviewing did not address the issue either. Correct. So I don't know where the ALJ at one point suggested sanctions, barring the attorney from proceeding with the case and participating in the case. But did you ever ask for sanctions for failure to comply with the subpoena? We asked that the inference that the court find that there are other documents that would have been there, and that's what the law says. You have an adverse inference. If you don't provide that information, there must be an adverse inference that you're hiding something, that the evidence that you would have had would have been detrimental to your case. Is that in the joint appendix, what you're suggesting now? I can find that perhaps on rebuttal if there's an exact cite. It's in the joint appendix. You just don't know where? I will check and confirm. Was this an oral request or was it a written request? It was not a written request. But the burden under the rule under Section 161 is that the board must seek to enforce a subpoena. And when the parties here came back and simply said, We're not going to provide this. We don't have enough time. And that's when the judge said, Well, you better go out and talk to your client and find out if she's going to produce documents. And then he came back and said, Well, she doesn't have anything. We're not going to find anything. And then I'm questioning. Was it only Morris? The subpoena was not only with respect to Morris, was it? The subpoena was to all three parties. All three. Why was it limited to the date of firing going forward? The board tried to make issue of this as well, saying, Well, you couldn't have considered the stuff after the firing as part of your termination. That's not what we're talking about here because you never saw that. Right. We're not saying that anything else. They weren't terminated. In your view, the evidence went to the question whether this was a sham. Exactly. And that evidence that occurred after the firing could be relevant. Because they had admitted after the firing, we celebrated, we giggled, we hugged each other. They had admitted after the firing, they fell into my crutches. They admitted after the firing, which is cut off. What a funny day I've had. And then it stops. If an employee comes back and admits, I did all these things for this purpose, I now have the right to whatever I have under the law, that would be an admission that would be damning to a claim to say that this is an honest and reasonable plea. Postings before the firing were put into evidence by you? By the NLRB. By the NLRB. And that was because these three individuals turned over their Facebook postings to the NLRB? Correct. Why did they do that? What prompted them to turn over Facebook postings to the NLRB? They made the claim that we were improperly terminated for concerted protective activity. It's our understanding that, again, an employee who has a mother who works in an employment law firm understands what these standards are and then goes and runs to the NLRB saying, hey, they fired me because of these Facebook postings. I don't understand. Do you mean if you know the law or you consult a lawyer, that's proof of luring in? That doesn't seem right. Not proof, but an indication of the fact that they had a plan in mind, that they intended to. I'm not sure why anything in that sentence about the employee handbook shows they had a plan in mind. What it shows is that they said they were being treated unfairly, and looking in the book it shows they can't treat us unfairly. That doesn't mean it's a plan to be fired. That means that they know their rights and they're going to assert their rights. Right. And those rights, the assertion of those rights, frankly, is pretextual here. When asked at the trial what were the rights that were in the handbook, well, we have a right to a microwave and a water cooler. And now the NLRB in its appeal brief, interestingly, is saying, well, it's all about safety. They were trying to protect for the protest for their safety. Being on Haight Street at night was dangerous. You're already saying, you're not claiming, are you, that whatever that book was on California law or whatever proves that they were, it's relevant, though, because it makes it more likely than not that, and that's just one little piece of evidence along with the other factors. It's relevant in the sense that Ms. Morris says, I never looked at the book. I just brought it in, set it at the table, and said, hey, take a look. And then I took it home, and then I wrote about it on Facebook to say, hey, I brought a workers' rights book in to demonstrate that the Facebook comments, which were the heart of this whole thing, were simply a sham, again, to demonstrate that my employer is violating the law and these employment laws against me. That's really, it's a prop in the sham. How many people worked at that particular store? There were, I believe the evidence was four to five, well, a total of seven to eight employees, I think, overall. There were three or four maximum in the store at one time. Why is it that the National Labor Relations Act even applies to that store? The claim was that it was because the employer had other stores in other locations, a joint employer for locations in Santa Barbara, San Diego. And that added up to, what is it, 50 employees? I believe it's 50 employees, yes, so the employer overall. With that, I'll reserve two minutes if I can. May it please the Court. Kelly Isbell here on behalf of the National Labor Relations Board. This is a substantial evidence case, and substantial evidence supports the Board's finding that these employees were engaged in protected, concerted activity. What protected activity, what concerted activity was Johnson engaged in? Johnson was part of the, the Facebook posts about bringing in the workers' rights book. When it started off, she was part of that discussion. She only, there was only one posting by Johnson. There was only one posting, and the ALJ characterized it as a knockoff. What was it, what was it, what was that one posting? That Betty Page would roll over in her grave. I've been thinking that for a while now. Yeah, so where's the concerted activity there? The concerted activity supposedly was that these employees didn't want to work past a certain time because it was a dangerous neighborhood. It was a range of concerted activity. So let's start with the... I want to know what Johnson's involvement in any of that is. Johnson signed the letter to the management about Griffin's behavior that affected their terms and conditions of employment. She was in the staff meetings where employees complained to Manager Griffin about their fears, their concerns about safety staying late at work at night. She was part of the Facebook conversation about bringing the workers' rights book in. The judge did say her particular comment was innocuous. But the issue for the judge was that Griffin, the manager, associated her with Thomas and Morris and said that she would like to put a gag order on her so that she could not discuss work with Griffin and Thomas, or with Morris and Thomas. Well, that raises a legal question. If an employer believes wrongly that an employee is engaging in concerted activity and the employee, in fact, is not, and then fires the employee for that, is that a violation of the NRA? That is an interesting hypothetical, and I would have to work on that for a little while. I mean, if she was not engaged in actual protected concerted activity But the employer believes she was and fires her for that reason. Then the board might find it to be a violation. But the threshold would be that she had to be involved in protected concerted activity. And here she clearly was. I mean, she was involved and she signed the letter, the original letter that went about Griffin. And she was associated with Morris and Thomas. And that was the connection the judge had. Of course she was. There were only four or five employees in the store. How could she help? But that doesn't necessarily mean that every one of them was engaging in concerted activity. Two of them could have gotten together and complained about the lack of a water fountain. Well, if they were complaining about the lack of a water fountain, that could be their terms and conditions of employment. I mean, I don't know that that would not be protected concerted activity. But this particular employee received a text message from Thomas. Manager Griffin saw it and immediately said, I want to put a gag order on you so that you cannot talk to them about work. The judge found that that connected her to Morris and Thomas who had recently been fired. And when she was fired, Ms. Johnson, he found that the reasons given for her firing were pretextual. There was no real reason for her firing except her connection to Morris and Thomas and the protected concerted activity that all the employees were engaging in up to that time. Why is it that the Facebook postings represent concerted activity? The ones that we have in the record. The Facebook post that is protected concerted activity is the workers' rights post on page 390 of the joint appendix. So that is the post where the employees were talking about bringing the California workers' rights book in. That's the post the board found to be part of the protected concerted activity. It was a continuation of their attempts to have management close the store one hour earlier. That attempt was denied. They complained about it on Facebook that night. And the workers' rights book is part of that discussion. What page, 390? 390, I believe. The other Facebook posts, there are a variety, but they're extra in a sense. I mean, it's the workers' rights post that's part of the protected activity. That was the continuation of the discussion with the owner about closing the store early. Is reinstatement still on the table? It seems to me that even when it was ordered, this is almost six years ago now, it is a matter of record that whether they were bluffing or not, they were looking for other jobs. It seems like an incredibly ill fit as a remedy. Reinstatement is still on the table, Your Honor. The board does not limit reinstatement unless there are definitive plans to leave or you've already gotten a job or for other reasons, like APICO ends where there is extreme misbehavior. Antagonism between the supervisor and employees is not reason to stop reinstatement, especially when that antagonism is part and parcel of the protected concerted activity. How about looking for another job? Looking for another job is not a reason to bar reinstatement. And what's the authority for that? The board's decision, and I think it's called Campbell Electric. What the board wants is if the employee has definitive plans to move, the employee has accepted an offer, the employee has told the employer, I'm leaving, I'm giving you my notice, then the board will not order reinstatement. It's simply looking for a job as people do. How about celebrating being fired? The board, the administrative law judge, remember, did not credit that testimony. I mean, that is completely incredible testimony on the part of Manager Griffin. The administrative law judge found that she and the owner were fabricating testimony, and he would not credit any of their testimony except as it was in the initiative. What about the postings? I thought some of those postings had it as well. Ms. Morris posted something she described as being sarcastic, that she was not actually celebrating when she was fired. She posted on Facebook what she considered to be a sarcastic statement. And the judge credited her testimony. I mean, he found that she was completely credible, and that there was no evidence that she and Ms. Thomas actually celebrated. They both said they hugged after they were fired and escorted out of the building. But they were not... But didn't the postings say something about freedom? Or was that... No, this particular post said, sarcastically, the best thing happened, we celebrated and giggled and high-fived. No, she also posted that she's glad to be away from that hard job. So go ahead and complain and do it. And then 8, the number 8. I think that may be some symbol, like the eyeglasses with the smile that she sometimes put in. That was a different post where she was complaining about her job. No, I don't think so, because the previous post talked about... Which, I'm sorry, can you tell me what page you're on? 390, 391. The California Labor Rights Bill. And it talked about a violation of 8, which seems to me to refer to Section 8 of the National Labor Relations Act. And you're on 390? Yeah, 390 and 391. 391. The 8, it's a symbol with eyeglasses and... You know how you make a smiley face? This is a smiley face with eyeglasses. And there's no finding that she was referring to the act. And I believe there's testimony where she described it as a smiley face with glasses. You're liking the ear on her eye. What's your explanation of the question on the subpoena? The ALJ dropped a footnote that doesn't seem to resolve the, in his opinion, it doesn't seem to, it doesn't resolve it. Well, if you read the transcript, Your Honor, what happened was, as you noted, this was an extremely broad subpoena, all cell phone records, all e-mails and texts between these employees and certain other employees. For Ms. Thomas, all employment applications, W-9s, forms with her Social Security number on it. The administrative law judge tried to narrow the request. He told the employer that they could ask about cell phone records if they needed to know about a particular phone call. They proffered that they wanted the cell phone records and the Facebook records to prove that employees were using cell phones and computers on work time. And the administrative law judge admonished them that they would not be allowed to fish for reasons not to rehire these employees. He let them ask employees whether or not they had more responses to the subpoena. They only asked Ms. Morris. Ms. Thomas and Ms. Johnson were on the witness stand. They never asked any questions. They never objected to the judge's narrowing. Morris's attorney said, you know, I haven't done anything to comply with the subpoena. And then counsel said, well, we'll ask her. And she gets on the stand and says, I haven't looked through my Facebook posts. And she also testified that they had all of her Facebook posts already. She had provided them at the start of the trial and that they had everything related to her comments about the job on her Facebook. They already had it. And that was her testimony. Well, how could you say that if you hadn't looked? She said that she had not posted about the job since then. The administrative law judge believed her. But remember, this particular question goes to whether or not there is a conspiracy to get fired, which both the board and the administrative law judge completely rejected. The issue is whether they're trying to get evidence to prove that and to say that, well, it was rejected is not an answer to whether the subpoena should have been introduced by the jury. On just the subpoena issue, at the trial, they did not object to the administrative law judge's narrowing. In their exceptions to the board, what they asked for was an adverse inference and or sanctions against that attorney. They never asked the general counsel to enforce the subpoena. And they did not tell the board that they did not bring up these merits issues. They asked for an adverse inference or sanctions against the employee's attorney. You have to ask the general counsel to enforce the board's subpoena? If in the trial, there is no indication that you are upset with what the judge did, and on this record, there is no indication. The judge narrowed it. They said, okay, and asked questions of Ms. Morris. They didn't believe her, but they never brought it back up to the judge that something else should be done. There was no indication for the judge or the general counsel that they needed to take further steps on this record. And I see I have completely run out of time. And they didn't raise before the board that it was an abuse of discretion to quash the subpoena? I'm sorry? They did not raise before? This is what you said in your brief, that they did not? They did not. We never quashed? No, they did not enforce it. I'm sorry. He partially quashed in the sense that he told them they could have some records in compliance. They wanted employment applications. That's for compliance. In the Facebook post. In the Facebook post, he allowed them to question witnesses. After he questioned that one witness, nothing was ever brought up to the judge or the general counsel again that that was inadequate. I know I've completely gone over my time. If I may, just very briefly, the board found that these employees were engaged in protected concerted activity. Whether they wanted to be fired, which the board rejected, is actually irrelevant to that question. If I don't like my supervisor and complain about the heat in my office with my other employees, let's assume I'm doing concerted activity, because I want to get my supervisor in trouble, it's still protected activity if I am raising an issue that relates to my terms and conditions of employment. Would it be protected activity if two employees post on Facebook something to the effect that the products here are overpriced and they're inferior goods and the store manager is a creep? Then you're talking about whether or not they're – that would be what I would consider to be a traditional Facebook case, where what the question is is whether or not they lost the protection of the act, whether they were disloyal or defamatory. And those are questions the board has answered in the affirmative in other cases where they found that Facebook posts were not protected. That kind of issue did not come up in this case. Further questions? Thank you. Does the petitioner have any time? All right, we'll give you another couple minutes. I would want to ask, where – point me in the JA where you explained the grounds for the discovery, that is, why you needed the discovery. Why we needed it? Yeah. Well, on 164 and 165, we talked – this is one of the questions, Ms. Morris, about looking for the Facebook documents. Earlier at the very beginning of the proceeding – this is actually before the trial took place – was the discussion of Mr. Rosenfeld, the attorney, saying, I'll be late, I'm not going to produce documents in time, and only when he was sent out to tell Ms. Morris. And I do not have a site for that up there. No, I'm just looking about why you needed the Facebook postings and such. Yeah. And there were discussions about the other – it was partially quashed. And the board actually joined in the motion to quash. So to answer the question about, you know, shouldn't the board be doing something, when we are proffering the subpoena through the board and then the board tries to quash our subpoena, then to go ask them to say, please go ask a district court to enforce this subpoena when they're asking to quash it would be a fool's errand. And we are not disputing the overbreadth determination on the cell phone records. There were some reasons that those were offered. But the Facebook postings, when Ms. Morris was asked specifically, what does that Facebook post be willing to say on 393, it's all, I don't know. It cuts off there. I don't know what is left there. And I didn't go back to look on it. She specifically says, I never looked. So I think that's critical in the determination. Did you tell the board why you needed that, I mean, the ALJ, why you needed that post? Well, all of the postings were proffered. The entrapment explanation for here's the postings and here's what they say, this is the entrapment. I know that's your theory now. I'm asking you where you made the entrapment theory to the board, to the ALJ. I don't know offhand. I apologize. Okay, that's all right. But that was certainly the crux of what the Facebook postings were. Excuse me. The board said you didn't argue before the board that the refusal to enforce the subpoena was an error or abuse of discretion. No, the exceptions were raised to the lack of enforcement. I thought the exception was to, I'm not giving the adverse inference. Was there an exception also to lack of enforcement? I didn't see that. Exception six. I wouldn't know what that is. It definitely was a reference to the adverse inference. Yeah, to the adverse inference. I'm talking about, that's another step. The question of whether they should have enforced the subpoena, which is what you're arguing here. Right. Well, in 164, 165, the court explains, move on. Last time you're going to ask about this, move on. And so we did not raise to say that it was his abuse of discretion. I don't think that was raised as an exception. But on review here, it's a review for abuse of discretion as far as the enforcement and lack of enforcement. Well, but not if you didn't raise that before the board. The board said he didn't raise it. That's what they said. And I looked in your reply brief and you didn't say, oh, yes, we did. You just let it go. No, I think we raised it under context as put in our Exception 6. But that one I'm reading is that's just about imposing adverse inference or other sanctions. Right, which should have been. Again, it's not a question of the board moving to enforce. It's a question of the employee not responding and not complying with it. To say, to go back to, let's say the board says, okay, we're going to enforce it. You need to comply with it now. And she said, and the court agreed with her, it would be fruitless. I didn't post it. Don't you have to get the ALJ to direct them to respond? You asked for all Facebook pages from 2010 to the present, regardless of the subject matter, everything, every single one. Correct. I can't imagine an ALJ granting that. So if you wanted to narrow that, and you agree with that, right? You couldn't possibly get every Facebook page. I understand. All right. So if you wanted something narrower, then you'd have to ask the ALJ to enforce a narrower subpoena. And then you'd have to say that ALJ abused its discretion by not doing that. And maybe we didn't say those magic words, Brad. The ALJ didn't narrow it. At that time said, okay, did you look for Facebook postings where a betting page or your workplace is mentioned? No, I didn't look for anything. Because I know, as I sit here today, two years later, that I didn't post anything after that date, even though I never looked for it. She also said, or at least the attorney represented after the recess, that the hearing took place in 2012. The events we're talking about took place in 2010. Correct. And the attorney at least represented to the ALJ that she had deleted the postings back that far, right? I think he said that he believed she could not retrieve them. But, again, she never looked. We didn't have the chance to go to Facebook and say, I don't know if they're retrievable at that point or not. Did you subpoena Facebook? We did not subpoena Facebook because we expected and anticipated that those postings, rather than getting Facebook. And I don't know what Facebook's policy is. I assume at an LRB proceeding, trying to jump through those hoops in time for that proceeding would be difficult, to say the least. But if she provided them already, she's provided the affirmative evidence. She also needs to provide the evidence that undercuts what she's trying to assert here. And just one last point. The question was raised about whether if there was not actual protected activity and the employer mistakenly terminated them. In a Lipsey case in the NLRB, it talks about the question whether someone's a bona fide applicant for employment. If he was not, no violation of Section 8 of the Act could have been said to have occurred, notwithstanding the intention of the respondent to discriminate against him. So NLRB says this is the conduct, this Facebook posting, this is it. And a lot of it happens to be with non-employees. This is the reason that we're claiming that it was the protected activity. If it's not, if it's a sham, if it's entrapment, and if you don't provide the evidence that would demonstrate that, then you can't make a finding of concerned protected activity. I've got one question, if you know. Are any of these women still employed by your client, specifically Griffin? Griffin is. I don't know specifically. The others have not been reinstated? They have not been, no. And on that, the question about the definitive plan to leave, they sent out resumes five days before they were fired saying, I'm immediately available and didn't list Betty Page on the resumes saying, I'm available whenever you need me. Well, I assume if they didn't get a job, they weren't going to leave. That's not the same. People can send out. The board's description of its cases, which fits my recollection, is, of course, if you accept a job, then of course, then you can't be reinstated. But just because you put out resumes, a lot of people in this world have put out resumes and don't get jobs. Sure. A lot of people, though, don't go to their employer's computer at the store, send them out when they know their employer is looking at those resumes also. So to the extent that, again, this is some sort of a valid employment search, it's not the way you do it. They were planning to leave. They didn't list Betty Page on their resume. And they said, I'm immediately available. So that point can be argued. But they didn't intend to be there. Okay. Thank you. All right. We'll take a matter under session. Thank you.
judges: Garland, Henderson, Randolph